STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, SS                                      CIVIL ACTION DOCKET NO.

| | |
|---|---|
| TAMMY ATKINS-POULIN, an adult individual resident of Winslow, County of Kennebec, State of Maine, | ) ) ) ) |
| and | ) ) |
| RAQUEL ELIASEN, an adult individual resident of Readfield, County of Kennebec, State of Maine, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| EDDIE BAUER, LLC, a Delaware limited liability corporation with a place of business and a registered agent in Augusta, County of Kennebec, State of Maine, | ) ) ) ) ) ) |
| Defendant | ) ) |

## COMPLAINT AND REQUEST FOR JURY TRIAL AND INJUNCTIVE RELIEF

Plaintiffs Tammy Atkins-Poulin and Raquel Eliasen (referred to individually as "Tammy" or "Raquel," and collectively as "Plaintiffs") make the following complaint against Defendant Eddie Bauer, LLC ("Eddie Bauer" or "Defendant").  Plaintiffs request a jury trial.

## NATURE OF ACTION

1.      This is an action for declaratory and injunctive relief and monetary damages to redress the deprivation of rights afforded to Plaintiffs under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §4551, *et seq.*, the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §831 *et seq.*, and to recoup unpaid wages and overtime owed to each Plaintiff as employees and individuals entitled to the protections of the Maine wage and hour laws, 26 M.R.S. §§ 621-A,

661 *et seq.*, and federal wage and hour laws under the Fair Labor Standards Act ("FLSA"), 29

U.S.C. §§ 201 *et seq.*

## PARTIES

2.     Plaintiff Tammy Atkins-Poulin is a female citizen of the State of Maine, living in

Winslow, Kennebec County.

3.     Plaintiff Raquel Eliasen is a female citizen of the State of Maine, living in

Readfield, Kennebec County.

4.     Defendant is a foreign corporation registered to do business in the State of Maine

with a place of business and a registered agent in Augusta, Kennebec County.

## JURISDICTION AND VENUE

5.     Venue is proper in Kennebec County pursuant to 14 M.R.S. §§ 501, 505.

6.     On August 14, 2017, Tammy and Raquel each filed a complaint of discrimination

with the Maine Human Rights Commission ("MHRC").

7.     More than 180 days having passed, the MHRC issued Tammy and Raquel a right

to sue letter on July 27, 2018, pursuant to 5 M.R.S. §§ 4612, 4622.

8.     Tammy and Raquel have exhausted their administrative remedies.

## JURY DEMAND

9.     Plaintiffs demand trial by jury on all claims to the extent allowed by law.

## FACTUAL BACKGROUND

10.     Raquel started working at Eddie Bauer on December 1, 2015 as a store manager.

11.     Tammy started working at Eddie Bauer as a sales associate.

12.     During their employment at Eddie Bauer, both Raquel and Tammy observed and

experienced a racially-hostile environment created by their managers' racist comments, racial

slurs and racially-motivated employment decisions, which they each found offensive and

reported to management.  For example:

    A.    On or around July 2016, the Eddie Bauer store in Augusta was interviewing for an assistant manager.  Angela Paine, the store manager, and Raquel were interviewing applicants.  A young African American man came in to interview.  He was very well dressed, had college in his background (which is a big deal in the retail world), was well spoken and professional.  He was the most qualified candidate for the job.  After Raquel recommended this man for the position, *Angela said, "no, we can't hire someone like that here."*  Raquel responded, "what do you mean 'like that?'"  *Angela said, "well he's black and customers won't buy anything from him."*  Raquel reported to Angela that that was *illegal*.  Nevertheless, *she just said, "we never hire people like that here."*  Angela ended up hiring a white man who was underqualified for the position, had no means of transportation to work, and ended up getting fired.

    B.    Also in the summer of 2016, Jennifer Karlson, the assistant store manager, asked Raquel to follow an African American family around the store.  Raquel told Jennifer that she did not feel comfortable doing that.  Jennifer responded, "well, you have to wait on them."  Jennifer made clear she did not want to help customers of color.

    C.    While Tammy was working with Jennifer that summer, she noticed that Jennifer would follow around the store people of color, including people who Jennifer called "Muslims" because they wore headscarves.  Jennifer did not follow white customers around the store.  On one occasion, *Jennifer told Tammy that Muslims are "towel heads," and asked Tammy if her husband had "taken pleasure in shootng them in Iraq."*  Tammy was disgusted by this behavior.  *She told Jennifer, "everyone deserves to be treated with respect."*  Jennifer replied, "not them."

    D.    Around Christmas-time, Raquel recalls that *Angela refused to hold a*

3

*jacket for a man because the name on the "hold" tag was "a black person name,"*
*according to Angela.*

E.     For the duration of their employment, Raquel and Tammy had to listen
while Angela and Jennifer constantly used racial slurs like *"porch monkey" (Angela),*
*"Nigger" (Jennifer), "Sammie" (Angela")* and *"Rag Head/Towel Head" (Jennifer).*
Also, neither Jennifer nor Angela would wait on or check out customers of color.  They
thought it was a joke to say to either Tammy or Raquel, *"oh your customers are here,"*
whenever black people or anyone else of color came into the store.

13.     Throughout their employment, Tammy and Raquel encountered several instances
where they were not paid for hours they worked.  For example:

A.     As will be more fully explained below, Tammy began to notice in the fall
of 2016 that her time cards did not look correct.  In other words, it looked like she was
not getting paid for hours worked.

B.     After Raquel looked into the matter that fall, she noticed that her time
cards, too, appeared to have been changed.  For example, her lunch break time would be
extended, so she was not getting paid for hours worked because it looked like she was
still taking "lunch," when she was in fact working.

C.     In addition to the manipulation of time cards, Eddie Bauer did not
compensate Tammy for time that she spent on the clock waiting for her manager to arrive
late (she would have to sit in the parking lot at work).

D.     In Raquel's case, in addition to the manipulation of her time cards, Eddie
Bauer also failed to compensate her for the several hours of work she performed at home
and before the normal work day setting up floor displays and performing other tasks
assigned to her.

4

      E.      On September 12, 2017, Raquel made a demand for payment of wages to Eddie Bauer under Maine law, explaining that she was owed unpaid time.

      F.      On September 29, 2017, Tammy made a demand for payment of wages to Eddie Bauer under Maine law, explaining that she was owed unpaid time because of her managers cutting back and manipulating her hours and not paying her for other time, including time she spent waiting in the parking lot for her manager to arrive at work late.

      G.      The amounts owed to Tammy and Raquel is subject to change based on the information in their punch-cards.

      H.      Eddie Bauer has failed to pay Tammy and Raquel their unpaid wages.

14.      Tammy and Raquel were not the only ones who noticed that their time cards did not look correct because they were being manipulated.

15.      In the fall of 2016, several employees (including Tammy, Jennifer and Jason Austin) reported to Raquel that their time cards did not look correct. In other words, it looked to all three of these employees like their time cards were being changed so that they each were not getting paid for the hours that they worked.

16.      Raquel told Tammy, Jennifer, and Jason that she would look into the matter for them.

17.      As soon as Raquel began looking at her *own* time cards more closely, she, too, noticed that her time cards were being changed and did not reflect the actual hours she worked.

18.      Raquel believed that it was illegal to not pay employees for the time they actually worked. She also believed it was wrong to manipulate the time cards the way that Angela Paine, Store Manager, was doing.

19.     On October 28, 2016, Raquel reported to Tina Williams, Regional Manager, that it looked like Angela was changing employee time cards.

20.     Raquel reported to Tina that Angela's manipulating of the time cards resulted in employees not getting paid for time they worked. In response, Tina asked something like, "why would she do that?"

21.     Raquel explained to Tina that Angela was trying to ensure that the store was under an allotted number of paid hours to employees for the month. Having employees working more than that number of hours would mean going "over payroll," and the managers, like Angela, would not get a bonus.

22.     "Making payroll hours" means that Angela was trying to make it look like the employees worked less than they really did by extending their lunch breaks or punching them out earlier than they really worked to lessen the worked paid time that showed on the system.

23.     Raquel told Tina the reason she thought Angela would be doing this would be to make payroll hours "look good" for corporate and pay the employees less. For example, meal breaks were being lengthened from 30 minutes to something longer like 50 minutes or an hour to make the remainder of the lunch break unpaid.

24.     In fact, people like Raquel were working after the end of the 30 minute lunch break, so what Angela was doing was denying them wages for actual time worked. Angela was setting up the system so that, even when an employee was working, it would show at various times that they were instead still at lunch.

25.     Instead of taking her seriously, Tina said to Raquel, "what kind of a friend are you?" Tina then asked Raquel if she "wanted to take Angela's job."

26.     Raquel responded that her intention was not to get Angela in trouble but to have someone check on what was going on. Raquel mentioned that breaks were being extended on

the system so that employees were not being paid for time they in fact worked.  Raquel said, "these people are making minimum wage; aren't you going to pay them for the time they worked?"

27.     Tina seemed angry.  She told Raquel "she would follow up with her," but she never did.

28.     On October 30, 2016, just a few days after the conversation with Tina, which was supposed to be confidential, Angela called Raquel into her office.

29.     Angela was visibly upset and shaking and told Raquel she just got off the phone with Tina, and asked, "do you have something you want to tell me?"  Raquel said, "well, not really."  Angela said, "well, Tina thinks that you feel that I am changing people's time punches."  Raquel responded that she did feel that there were a lot of time punch changes being made.

30.     At that time, Angela and Raquel actually reviewed time cards for Tammy, Jason and Raquel herself.

31.     Raquel pointed out three discrepancies on her own time card showing lunch breaks that Angela had extended.  Angela just said, "I don't know what that is."  The paperwork showed that the lunches were actually extended and it also showed that Angela was the person who changed the time sheet.

32.     When Angela and Raquel reviewed Tammy and Jason's time cards, Raquel saw that 15 minute breaks were being added in on time sheets, as if the employee had clocked out and in and taken a break even if the employee had not punched in and out themselves (for example when they didn't in fact take a break).

33.     Angela then turned to Raquel and said, "in all my years here I have never had someone go over my head and now I won't trust you.  I don't understand why you would not

come to me first and not ask me about it." Raquel explained to Angela that she was just following the chain of command.

34.     Angela told Raquel that she no longer trusted or felt comfortable with her. She also accused Raquel of "causing a divide" in the store. Shortly after this meeting, it became clear to Raquel that Angela was trying to drive her out as a result of her reporting illegal conduct.

35.     For example, Angela knew that Raquel had young children, and, all of a sudden, Raquel was being scheduled more frequently for evening and weekend hours. Prior to this in October 30, 2016, Angela would schedule Raquel only two nights a week.

36.     Angela also started excluding Raquel from Monday conference calls and from doing the scheduling together. Prior to Raquel reporting the time punch problems, Angela would collaborate with Raquel and discuss the hours needed for Raquel to set up displays and floor sets.

37.     On December 16, 2016, Angela called Raquel into her office and accused her of causing a "hostile work environment in the office." Angela told Raquel that having the employees report to Raquel about time card issues was "creating a divide in the store."

38.     Raquel responded that the employees should feel comfortable reporting to her. In response, Angela said, "not everything is black and white here." Angela also stated "rules were made to be broken." Raquel didn't ask Angela what she meant, but assumed Angela was talking about the time cards and how employees should stop complaining.

39.     During this time, December 2016, Tammy was working as a sales associate. She was reporting to Raquel whenever her time card looked off, like something had been changed.

40.     Also in December of 2016, Tammy began to witnesses Jennifer marking down sale items and full priced items at extremely low prices to benefit herself and others. Jennifer also used other people's discounts and rewards coupons to purchase items for herself. Tammy reported Jennifer's actions to Angela.

8

41.     Angela did nothing.  The policy communicated through this course of conduct was that using other people's rewards and coupons was permitted.

42.     Tammy was therefore confused when she was called into Angela's office in late January/early February 2017 to discuss Raquel returning items, using her mom's rewards and credit card and getting cash back.  The policy as historically applied to employees like Jennifer was that such actions were allowed and permitted.

43.     Tammy had never seen or heard of a store policy that someone could not give cash back and it had always been allowed prior to the retaliation taken against Raquel.

44.     Tammy also was unaware of any policy stating rewards could only be used by the person whose name was on the reward. Raquel was using the rewards for her mother under her mother's rewards card, and such use had always been allowed before for others.

45.     Tammy recalls asking Angela, "why don't you just talk to her [Raquel], because I don't think she is aware of any wrongdoing."  Angela and Jennifer stated that, without Raquel, the store would have a "less hostile environment."  Tammy did not agree with that at all.

46.     At this point, Angela and Jennifer ordered Tammy to "watch" Raquel.  Angela and Jennifer did not ask Tammy to "watch" any other employee.  Tammy responded that she was uncomfortable about spying on Raquel and asked, "why only Raquel?"  Angela and Jennifer told her she would lose her job if she didn't.

47.     Fearing that she would lose her job, Tammy did what Jennifer and Angela told her to do and then told Angela and Jennifer what she saw.. Tammy said, "I haven't seen any policies saying that those things are wrong."  Jennifer and Angela wanted Tammy to report to the Eddie Bauer loss prevention department ("LP") that what Raquel was doing was "fraud."

48.     On February 22, 2017, Raquel was closing the store. One register ("Register 1") was short $50.00. Raquel noticed that another register ("Register 3") was $50.00 over. As is the custom, Raquel took the $50.00 from Register 1 to bring over to Register 3.

49.     However, Raquel got distracted with closing paperwork and accidentally left the store that evening with the $50.00 still on her. Raquel called the store when she realized she still had the $50.00 and initially spoke to Tammy. Eventually, Raquel was transferred to Angela. Raquel told Angela what had happened and Angela responded that, "it was not big deal," and "just bring it in on your next shift."

50.     As instructed by Angela, Raquel brought the $50.00 back on her next shift, which was February 27, 2017. She did not receive any sort of reprimand, write-up or discipline for this mix up.

51.     Unbeknownst to Raquel, Eddie Bauer had already decided to get rid of Raquel because of her earlier whistleblowing. On or about February 24, 2017, Angela called Tammy into her office. She told Tammy that someone from Eddie Bauer LP was on the phone and they wanted to talk to Tammy. Angela had the phone on hold so that LP couldn't hear anything and Angela had a piece of paper with bullet points on what she wanted Tammy to say.

52.     Angela stated to Tammy, "here, this is what I want you to relate to when talking to LP." It was a bullet point list of the things that Jennifer and Angela had accused Raquel of doing. Tammy was told to read what Angela had written to the woman on the phone. Tammy was then ordered to write out a report.

53.     Tammy told Angela that she didn't feel comfortable writing a statement using the bullet points because she felt like, at that point, she didn't even know what the store policies were. *Angela told Tammy that, if she did not fill out the report as she was told, she would be let go.* Tammy filled out the report as she was told.

54.     On February 27, 2017, Kris Fullerton from Eddie Bauer loss LP called Raquel out of the blue. Kris stated, "I am looking into fraud that you have been doing." Raquel was shocked and had no idea what Kris was talking about. Kris told Raquel that she had broken many of Eddie Bauer's rules. Kris told Raquel she was coming after her.

55.     After having a chance to process what was going on and what Kris was accusing her of, Raquel explained to Kris that everything she was claiming Raquel had done wrong was something most all of the employees do. Raquel also told Kris that she had never been told or read anything stating it was wrong, for example, to return things for your mother.

56.     Raquel also told Kris that Angela certainly had not trained her on any of the so-called "rules," that Kris was saying Raquel had broken. She told Kris that Angela had told Raquel, "you need to train yourself."

57.     Kris then told Raquel that, if she filled out an LP "voluntary statement," it would help her chances of keeping her job. Raquel filled one out believing Kris that it would help her keep her job and that HR would review it before making any decision. This turned out to be false. HR didn't even review the LP statement until 6 weeks *after* Raquel was fired.

58.     Raquel was terminated by Angela that same day, on February 27, 2017.

59.     At the time she was terminated, Angela said Raquel was being let go because of the incident with the $50.00.

60.     Later, when Raquel applied for unemployment, Eddie Bauer told the Department of Labor (DOL) that Raquel was fired for having a non-manager cash her out, using her mother's rewards, making purchases for her mother, using her mother's discount, and the $50.00.

61.     Prior to reporting illegal conduct, Raquel was never disciplined or written up for any of the reasons that Eddie Bauer was now claiming were the reasons it fired her. The reasons Raquel was given for her termination were not *even violations of any policy*.

62.     In March of 2017, Raquel was granted unemployment because Eddie Bauer had not proven that she was terminated for misconduct and could not point to a *single policy* that Raquel had broken.

63.     Although Eddie Bauer had claimed what Raquel had done was a violation of policy, only weeks after Raquel's termination two managers had Tammy cash them out and Jennifer herself had Tammy cash her out plus use her boyfriend's points and his card – which is what Raquel had been fired for.  Tammy reported this to management and was told that Eddie Bauer "just wanted Raquel out of there."

64.     Tammy then reported to the store manager that Jennifer, the assistant manager, had done what Raquel was just fired for.  Tammy was told it was ok.

65.     In March of 2017, Eddie Bauer in the Augusta location started taking applications to fill Raquel's job (Co-Manager) and a part time manager's position.  Tammy filled an application out for the part-time manager's position and put it where applications were placed. She didn't even receive an interview.  To the contrary, Jennifer told Tammy she was going to have Tammy fired just like Raquel.

66.     The retaliation by Jennifer against Tammy for Tammy's own reports of illegal conduct got worse.  It included sending Tammy home, calling her a crazy bitch, and then once again denying Tammy a job she had applied for, instead hiring someone with much less experience, no education, and with a felony record.  When Tammy asked why she was rejected for the job, management claimed to have not received her application.

67.     Jennifer then escalated the retaliation further, refusing to give Tammy breaks and refusing to answer her questions about work such as pricing.  Tammy reported the refusal to give her breaks to the store manager, as well as the other retaliation.

68.     Tammy reported to Angela, the store manager, that she felt threatened by Jennifer, assistant manager, and reported the retaliation she had experienced.  Nothing changed.

69.     When Tammy reported stealing by Jennifer, the assistant manager, she was told that she needed to bring in some type of proof before anyone above her could react.  Tammy pointed out that no proof was required when it came to Raquel.

70.     In March or April 2017, the store was going through employees every few weeks, so it needed to hire.  While working the store, several applicants arrived for interviews.  A young African American woman came in to interview.  Tammy called Angela to let her know that an applicant was waiting.  When Angela came out from the back, and Tammy pointed to the woman, Angela said, "*Oh God another one.*"  Tammy asked her what she was talking about.  She said, "another black person."  Angela did not shake this woman's hand.  She shook *every other* applicant's hand (who was white).

71.     The applicant did not get hired.  The person who was hired as the part-time manager was a white male.

Because of her reporting, the retaliation against Tammy just continued to get worse.  Jennifer, the assistant manager, was making rude comments about Tammy in front of customers, asking her if she took drugs, telling her she was acting "crazy," and more.  The store manager took no action to stop the retaliation.

72.     Tammy felt she had no choice but to give her notice.  When she did, the store manager stated that she was glad Tammy would be gone because then "the drama would stop."  At Raquel's unemployment hearing in May 2017, the Maine Department of Labor hearing officer found that she "followed the existing rules as well as the store manager's clarifications regarding credit cards."  The loss prevention officer for Eddie Bauer testified that she agreed she had told Raquel that she "was being singled out."  She agreed that she said, "this is absolutely

about you." She was aware that many were doing the same as Raquel had done but that only Raquel was singled out.

## COUNT I
## VIOLATION OF WPA, 26 M.R.S. § 833(1)(A)

73. Tammy and Raquel reallege and hereby incorporate the paragraphs set forth above as if set forth in their entirety.

74. Eddie Bauer discriminated against Tammy and Raquel, respectively, with respect to tenure, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of actions taken by each woman that are protected under the WPA, in violation of the MHRA, 5 M.R.S. § 4572(1)(A).

75. Tammy and Raquel were each singled out for treatment that non-whistleblowers were not.

76. Tammy and Raquel each reported to Eddie Bauer what they had reasonable cause to believe were violations of state or federal law. *See* 26 M.R.S. § 833(1)(A).

77. Raquel reported her good faith belief that it was illegal to refuse to assist customers and refuse to hire people solely based on their race or national origin and that it was illegal to change employee timesheets and not pay employees for the time they were working. No one at Eddie Bauer did anything to correct its illegal practices. *See* 26 M.R.S. § 833(2).

78. Instead, as a result of Raquel's reports, Eddie retaliated against her and terminated her for violations of "policies" that either did not exist or were never enforced (except in the case of Raquel after she reported).

79. Tammy reported her good faith belief that it was illegal to refuse to assist customers and refuse to hire people solely based on their race or national origin and that it was illegal to fire an employee (Raquel) under policies that no one else was even being disciplined for. No one at Eddie Bauer did anything to correct its illegal practices. *See* 26 M.R.S. § 833(2).

14

80.     Instead, as a result of Tammy's reports, Eddie Bauer retaliated against her by disciplining her for no reason, ostracizing her within the company, and refusing to consider her for job positions for which she was qualified.  Tammy was constructively terminated because no reasonable employee would have been able to endure the hostility to which she was subjected.

81.     As a proximate result of Eddie Bauer's unlawful conduct alleged herein, Tammy and Raquel have each suffered job loss, lost income, emotional distress, loss of enjoyment of life, inconvenience, and other pecuniary and non-pecuniary losses.

82.     Neither Tammy nor Raquel have an adequate or complete remedy at law to fully redress the wrongs alleged, and Eddie Bauer is likely to perpetrate similar acts on others unless they are enjoined by this Court.

83.     Eddie Bauer's unlawful conduct alleged herein was intentional.

84.     Eddie Bauer's unlawful conduct alleged herein was undertaken with malice or with reckless indifference to Tammy and Raquel's rights.

## COUNT II
## VIOLATION OF 26 M.R.S. §§ 626, 626-A

85.     Tammy and Raquel repeat and incorporate by reference all allegations set forth in the paragraphs above.

86.     Tammy and Raquel were each employed by Eddie Bauer and were employees and individuals entitled to the protections of the Maine wage and hour laws, 26 M.R.S. §§ 621-A, 661 *et seq*.

87.     Eddie Bauer is, and at all relevant times was, subject to the Maine wage and hour laws, 26 M.R.S. §§ 621-A, 661 *et seq*.

88.     On numerous occasions, Eddie Bauer failed to pay Tammy and Raquel for hours that each woman worked.

15

89.     On September 12, 2017, Raquel made a written demand for payment of wages to Eddie Bauer as required by 26 M.R.S. § 626-A.

90.     On September 29, 2017, Tammy made a written demand for payment of wages to Eddie Bauer as required by 26 M.R.S. § 626-A.

91.     Despite Tammy and Raquel's respective demands, Eddie Bauer failed to pay them within 8 days as required by 26 M.R.S. § 626-A.

92.     Because of Eddie Bauer's continued violation of 26 M.R.S. §§ 626, 626-A, Tammy and Raquel have suffered, and continue to suffer, damages.

## COUNT III
## VIOLATION OF THE FLSA, 29 U.S.C. § 201 *et seq*

93.     Tammy and Raquel repeat and incorporate by reference all allegations set forth in the paragraphs above.

94.     Tammy and Raquel were, at all relevant times, employed by Eddie Bauer and were employees and individuals entitled to the protections of the FLSA, 29 U.S.C. § 201 *et seq*.

95.     Eddie Bauer was, at all relevant times, subject to the provisions of the FLSA, 29 U.S.C. §§ 201 *et seq*.

96.     Upon information and belief, Eddie Bauer has more than two employees and $500,000 annually in sales, and it regularly uses mail, telephone and e-mail for interstate communication and receives and handles interstate goods.

97.     During Tammy and Raquel's respective employment with Eddie Bauer, the company failed to pay them for certain hours they worked.

98.     Eddie Bauer intentionally and without good faith violated the FLSA.

99.     Eddie Bauer knowingly withheld wages due to Tammy and Raquel.

100.    As a result of Eddie Bauer's willful violation of the FLSA, Tammy and Raquel have suffered, and continue to suffer, damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an Order providing as follows:

A.      Enter judgment declaring that the Defendant's practices complained of herein are unlawful as alleged;

B.      Grant injunctive relief compelling the Defendant to desist from all unlawful harassment and retaliation;

C.      Order the Defendant to pay Plaintiffs each back pay, plus compensatory damages for non-pecuniary losses, including, but not limited to, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life;

D.      Order the Defendant to pay Plaintiffs each civil penal damages pursuant to 5 M.R.S. §4613(2)(B)(7);

E.      Order Defendant to pay Plaintiffs each their unpaid wages plus an additional amount equal to twice the amount of unpaid wages as liquidated damages and a civil forfeiture of $500.00, pursuant to 26 M.R.S. § 626-A;

F.      Order Defendant to pay Plaintiffs each their unpaid wages plus an additional amount equal to twice the amount of unpaid wages as liquidated damages pursuant to the FLSA, 29 U.S.C. § 216(b);

G.      Order the Defendant to pay all litigation costs and expert witness fees;

H.      Order the Defendant to pay Plaintiffs each nominal damages;

I.      Order the Defendant to pay Plaintiffs pre-judgment, post-judgment interest, and reasonable attorneys' fees;

J.      Grant Plaintiffs such additional relief as this Court deems appropriate.

Rebecca S. Webber, Esq., Bar No. 7908
Jordan Payne Hay, Esq., Bar No. 5611
*Attorneys for Plaintiffs*
SKELTON TAINTOR & ABBOTT
95 Main Street
Auburn, ME 04210
(207) 784-3200
rwebber@sta-law.com
jphay@sta-law.com

**DATED:**      September 25, 2018